**JASON WRIGHT, OSB NO. 062168**
jason@wrightlawpdx.com
WRIGHT LAW PDX
1500 SW 1st Avenue, Suite 730
Portland, OR 97201
Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| HALLMARK SPECIALTY INSURANCE COMPANY,<br><br>             Plaintiff,<br><br>     v.<br><br>CURA PARTNERS INC., NITIN KHANNA, KARAN KHANNA, ANGELO LOMBARDI, SAM KNAPP, DAVID THOMPSON, NICHOLAS J. SLINDE, BENJAMIN C. STOLLER, and ALLAN GOODMAN.<br><br>             Defendants. | Case No. 3:23-CV-00264<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT** |

**COMPLAINT FOR DECLARATORY JUDGMENT**

Plaintiff, Hallmark Specialty Insurance Company ("Hallmark"), for its Complaint for Declaratory Judgment, states as follows:

**NATURE OF THE ACTION**

1.     This is an insurance coverage dispute in which Hallmark seeks a declaration that Cura Partners Inc. ("Cura Partners") is not entitled to coverage under a first excess insurance policy Hallmark issued to Cura Partners (the "Hallmark Policy") for two underlying matters pending against Defendants, Nitin Khanna ("N. Khanna"), Karan Khanna ("K. Khanna"), Angelo

Page 1 – COMPLAINT FOR DECLARATORY JUDGMENT

Lombardi, Sam Knapp, David Thompson, Nicholas J. Slinde, Benjamin C. Stoller, and Allan Goodman ("Defendants") (the "Reported Matters").

2. The Reported Matters arise from Cura Partners' spinoff of its CBD business, which had previously existed as a Cura Partners' subsidiary named Cura Wellness, LLC ("Cura Wellness"), into Sentia Wellness, Inc. ("Sentia") as a standalone company.

3. The primary policy to which the Hallmark Policy follows form has an exclusion (the "Curaleaf Exclusion") providing that Hallmark will not be liable for **Loss**[1] "on account of any **Claim** brought or maintained by, on behalf of, in the right of, or at the direction of Curaleaf Holdings Inc., its directors, officers, employees, subsidiaries, affiliates or shareholders thereof."

4. The Reported Matters are brought by shareholders of Curaleaf Holdings Inc. ("Curaleaf") at the time of the Sentia spinoff and/or Curaleaf Holdings' acquisition of Cura Partners.

5. Because the Reported Matters are a **Claim** brought or maintained by, on behalf of, in the right of, or at the direction of Curaleaf Holdings Inc., its directors, officers, employees, subsidiaries, affiliates or shareholders thereof, the unambiguous Curaleaf Exclusion precludes coverage for the Reported Matters.

## PARTIES

6. Hallmark is an insurance company organized under the laws of the State of Oklahoma with its principal place of business in Dallas, Texas.

7. Cura Partners is a corporation organized under the laws of the State of Oregon with its principal place of business in Portland, Oregon.

8. Nitin Khanna ("N. Khanna") is domiciled in and a citizen of the State of Oregon.

9. Karan Khanna ("K. Khanna") is domiciled in and a citizen of the State of

---

[1] Terms in bold are defined in the Hallmark Policy and/or the underlying primary policy to which the Hallmark Policy follows form, as further described below.

Page 2 – COMPLAINT FOR DECLARATORY JUDGMENT

California.

10. Angelo Lombardi ("Lombardi") is domiciled in and a citizen of the State of Tennessee.

11. Sam Knapp ("Knapp") is domiciled in and a citizen of the State of Oregon.

12. David Thompson ("Thompson") is domiciled in and citizen of the State of Oregon.

13. Nicholas J. Slinde ("Slinde") is domiciled in and a citizen of the State of Oregon.

14. Benjamin C. Stoller ("Stoller") is domiciled in and a citizen of the State of Oregon.

15. Allan Goodman ("Goodman") is domiciled in and a citizen of Toronto, Ontario.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1332(a), 2201, and 2202, as complete diversity exists between the parties and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and Hallmark seeks declaratory relief with respect to a case of actual controversy within this Court's jurisdiction.

17. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(1) and (2), in that certain Defendants are residents within this judicial district and a substantial part of the events or omissions giving rise to this action occurred within this district.

## THE CURA PARTNERS POLICIES

18. Scottsdale Indemnity Company issued a Business and Management Indemnity Policy No. EKI3312341 to Cura Partners for the **Policy Period** of November 17, 2019 to November 17, 2020 (the "Scottsdale Policy"). A true and accurate copy of the Scottsdale Policy is attached hereto as **Exhibit 1**.

19. The Scottsdale Policy went into run-off effective February 1, 2020 through February 1, 2026. (*Id.* at pg. 86 of 86.).

20. Hallmark issued the excess Hallmark Policy to Cura Partners bearing Policy No. 74PV000399-1 for the **Policy Period** of November 17, 2019 to November 17, 2020. A true and accurate copy of the Hallmark Policy is attached hereto as **Exhibit 2**.

21. Like the Scottsdale Policy, the Hallmark Policy went into run-off effective February 1, 2020 through February 1, 2026. (Ex. 2 at pgs. 20-21 of 21).

22. Subject to its terms, conditions, endorsements, and provisions, the Hallmark Policy generally follows-form to the Scottsdale Policy, unless otherwise stated therein. (*Id.* at pg. 6 of 21)

23. Subject to its terms, conditions, and provisions, the Directors and Officers and Company Coverage Section (the "D&O Coverage Section") of the Scottsdale Policy, to which the Hallmark Policy follows-form, includes the following Insuring Clauses with respect to **Claims** made against **Directors and Officers**:

   A. **INSURING CLAUSES**

   1. The **Insurer** shall pay the **Loss** of the **Directors and Officers** for which the **Directors and Officers** are not indemnified by the **Company** and which the **Directors and Officers** have become legally obligated to pay by reason of a **Claim** first made against the **Directors and Officers** during the **Policy Period** or, if elected, the Extended Period, and reported to the **Insurer** pursuant to Section E.1. herein, for any **Wrongful Act** taking place prior to the end of the **Policy Period**.

   2. The **Insurer** shall pay the **Loss** of the **Company** for which the **Company** has indemnified the **Directors and Officers** and which the **Directors and Officers** have become legally obligated to pay by reason of a **Claim** first made against the **Directors and Officers** during the **Policy Period** or, if elected, the Extended Period, and reported to the **Insurer** pursuant to Section E.1. herein, for any **Wrongful Act** taking place prior to the end of the **Policy Period**.

(Ex. 1 at pg. 21 of 86).

24. **Claim** means, in relevant part, "a civil proceeding against any **Insured** seeking monetary damages or non-monetary or injunctive relief, commenced by the service of a complaint or similar pleading…[or] an arbitration proceeding against any **Insured** seeking monetary damages or non-monetary or injunctive relief[.]" (*Id.*).

25. The Scottsdale Policy defines **Insured** to mean the **Company** and the **Directors and Officers**. (*Id.* at pg. 22 of 86).

26.     **Company** is defined as the **Parent Company** (i.e., Cura Partners and Terwilliger Partners LLC) and any **Subsidiary**. (*Id.* at pg. 8 of 86).

27.     **Subsidiary** means:
1. any entity of which more than fifty percent (50%) of the outstanding securities representing the present right to vote for the election of such entity's directors or managers are owned by the **Parent Company**, directly or indirectly, if such entity:

    i.  was so owned on or prior to the inception date of this **Policy**; or

    ii. becomes so owned after the inception date of this **Policy**; and

2. any joint venture entity in which the **Parent Company**, or an entity described in a. above, has an exact fifty percent (50%) ownership of the interests of such joint venture entity and where, pursuant to a written joint venture agreement, the **Parent Company** or entity described in a. above solely controls the management and operations of such joint venture entity.

(*Id.* at pg. 9 of 86).

28.     Section B.4. of the D&O Coverage Section of the Scottsdale Policy, as amended by Endorsement Nos. 24, 30, and 39, provides, in relevant part, that **Directors and Officers** means any person who was, now is, or shall become: a duly elected or appointed director, officer, or similar executive of the **Company**, or any member of the management board of the **Company**; any natural person who is a leased employee or is contracted to perform work for the **Company**, or is an independent contractor for the **Company**, but only to the extent such individual performs work or services for or on behalf of the **Company**; and **Employed Lawyers** of the **Company**. (*Id.* at pgs. 22, 54, 61, and 74 of 86).

29.     **Employed Lawyers** means employees of the **Company** who:
1. are admitted to practice law in one or more jurisdictions in the United States of America; and

2. are employed within the **Company's** office of the general counsel or its functional equivalent; and

3. acting solely in the capacity of providing professional legal services to the **Company**.

Page 5 – COMPLAINT FOR DECLARATORY JUDGMENT

> An individual shall not be deemed to be an **Employed Lawyer** to the extent such individual renders or rendered professional legal services to persons or entities other than the **Insureds**.

(*Id.* at pg. 61 of 86).

30. **Wrongful Act** is defined in Section B.9 of the D&O Coverage Section of the Scottsdale Policy, as amended by Endorsement No. 43, to mean, in relevant part any actual or alleged error, omission, misleading statement, misstatement, neglect, breach of duty or act allegedly committed or attempted by:

> a. any of the **Directors and Officers**, while acting in their capacity as such, or any matter claimed against any **Director and Officer** solely by reason of his or her serving in such capacity; …

(*Id.* at pgs. 22-23).

31. Section C.1.j. of the D&O Coverage Section of the Scottsdale Policy, as amended by Endorsement No. 18, provides that the **Insurer** shall not be liable for **Loss** on account of any **Claim**:

> j. for a **Wrongful Act** actually or allegedly committed or attempted by any of the **Directors and Officers** in his or her capacity as a director, officer, trustee, manager, member of the board of managers, or equivalent executive of a limited liability company or employee of, or independent contractor for or in any other capacity or position with any entity other than the **Company**; …

(*Id.* at pgs. 23-24).

32. The Curaleaf Exclusion contained in Endorsement No. 36 to the Scottsdale Policy provides:

> **Insurer** shall not be liable for **Loss** under [the D&O Coverage Section] on account of any **Claim** brought or maintained by, on behalf of, in the right of, or at the direction of Curaleaf Holdings Inc., its directors, officers, employees, subsidiaries, affiliates, or shareholders thereof.

(*Id.* at pg. 71 of 86).

33. Pursuant to Endorsement No. 2, Section O. is added to the General Terms and Conditions Section of the Scottsdale Policy and provides:

> O. ALLOCATION
>
> 1. In the event the **Insurer** has the duty to defend a **Claim** under any Coverage Section in which both **Loss** that is covered by the applicable

Coverage Section and loss which is not covered by the applicable Coverage Section is incurred, either because such **Claim** includes both covered and uncovered matters or because such **Claim** is made against both covered and uncovered parties, then:

a. this **Policy** shall pay one hundred percent (100%) of **Costs, Charges and Expenses** incurred by such **Insured** on account of such **Claim**; and

b. there shall be a fair and equitable allocation of any remaining loss incurred by such **Insured** on account of such **Claim** between covered **Loss** and uncovered loss based upon the relative legal and financial exposures and the relative benefits obtained.

2. In the event the **Insured** has the duty to defend a **Claim** under any Coverage Section in which both **Loss** that is covered by the applicable Coverage Section and loss which is not covered by the applicable Coverage Section is incurred, either because such **Claim** includes both covered and uncovered matters or because such **Claim** is made against both covered and uncovered parties, then the **Insured** and the **Insurer** shall use their best efforts to determine a fair and proper allocation as between such insured and uninsured loss, taking into account the relative legal and financial exposures and the relative benefits obtained.

(*Id.* at pg. 30 of 86).

## THE REPORTED MATTERS

### I.    The Measure 8 Lawsuit

34. On January 6, 2022, Measure 8 Ventures, LP, Gron Ventures Fund I, LP, Zola Global Investors Ltd., Anson Advisors, Inc. on behalf of Anson East Master Fund LPO, AC Anson Investments Ltd., Anson Investments Master Fund LP and Anson Opportunities Master Fund, LP, Serendipity SPC – Trimble Fund SP on behalf of Emerald Spur Limited, Lapid US Investments LLP, and Hadron Healthcare and Consumer Special Opportunities Master Fund (the "Measure 8 Parties") filed a lawsuit in the Circuit Court for the State of Oregon under Case No. 22CV00946 (the "Measure 8 Lawsuit") against Nitin Khanna (former Executive Chairman of Sentia and Cura Partners, Inc.), Karan Khanna (Chairman of the Sentia Board of Directors), Angelo Lombardi (former President of Sentia and Chief Operating Officer of Cura Partners), Sam Knapp (former Senior Vice President of Finance at Sentia and Cura Partners), Nicholas J. Slinde (former Director

of Sentia and Cura Partners, and outside general counsel to Sentia, Cura Partners, and Cura Wellness), and Benjamin C. Stoller and Allan Goodman (former outside counsel to Sentia, Cura Partners, and Cura Wellness) (collectively the "Underlying Defendants").  A true and correct copy of the complaint filed in the Measure 8 Lawsuit is attached hereto as **Exhibit 3**.

35. The Measure 8 Parties allege that they purchased over $74 million in Sentia debentures between April 2019 and July 2019.

36. The Measure 8 Parties allege that in January 2019, N. Khanna informed them about a potential plan to separate Cura Partners, Inc.'s THC business from its CBD business which operated in Cura Wellness, LLC, a wholly owned subsidiary of Cura Partners.

37. The Measure 8 Parties allege that on March 7, 2019, N. Khanna began officially soliciting a new round of debenture funding with an email and slide deck which emphasized the quick growth of CBD revenue, among other things.

38. The Measure 8 Parties allege that on April 4, 2019, N. Khanna emailed them and misrepresented that Sentia could and would earn CBD revenue of $175 million to $200 million for 2019.

39. The Measure 8 Parties allege that on April 23, 2019, N. Khanna emailed them with the official debenture funding sale, which outlined the plan to sell Cura Partners' THC business to Curaleaf in the largest cannabis merger in history and spinoff Cura Wellness into Sentia, and requested that the Measure 8 Parties convert their previous Cura Partners debentures into equity in Curaleaf and Sentia.

40. The Measure 8 Parties allege that the debenture conversion and new debenture sale required the Measure 8 Parties to execute the Debentureholder Extraordinary Resolution (which converted their 2018 Cura Partners debentures into equity in Curaleaf and Sentia), and the Subscription Agreement and Debenture Agreement (which were the sales contract for the 2019 Sentia debentures).

41. The Measure 8 Parties allege that the Underlying Defendants, except for N.

Khanna, actively participated in negotiating, drafting, reviewing, editing, and overseeing the preparation and execution of these three agreements.

42. The Measure 8 Parties allege that N. Khanna induced them to purchase Sentia's debentures by misrepresenting that Sentia would generate over $175 million in revenue for 2019.

43. The Measure 8 Parties allege that, at the time of the projected revenue, N. Khanna knew but omitted that Cura Wellness's retail and distributor customers had not contracted to make recurring purchases, Cura Wellness's March 2019 revenue was artificially inflated with channel stuffing, Sentia would not sell Cura Wellness's Select brand of CBD products, Sentia purchased expired and unsellable inventory, Sentia would not sell into marijuana dispensaries, and that Sentia did not have sufficient manufacturing equipment to meet N. Khanna's projections.

44. The Measure 8 Parties also allege that N. Khanna misrepresented that Goldman Sachs would represent Sentia in a private placement or initial public offering worth billions of dollars.

45. The Measure 8 Parties allege that N. Khanna sold Sentia as a continuation of Cura Wellness's existing business, and represented on May 1, 2019 that Sentia would be the same CBD business going forward.

46. The Measure 8 Parties allege that Sentia's financial spreadsheets included Cura Wellness' sales before Sentia was formed, including Cura Wellness' sales back to 2018.

47. The Measure 8 Parties allege that on April 17, 2019 N. Khanna had a phone call with Gron Ventures where he represented he would be the CEO of Sentia, and that he began taking a salary in May 2019 despite the fact that his "first real full day" at Sentia was not until February 2020.

48. The Measure 8 Parties allege that they discovered in February 2020 that Sentia's total revenue for 2019 was $19,430,433 – which was $155 million less than the $175,834,035 that N. Khanna projected in April 2019.

49. The Measure 8 Parties further allege that they visited Sentia's manufacturing

facility on February 25, 2020 and found it nearly empty, and subsequently hired an accounting firm to do an independent audit which showed that Sentia had millions of dollars in expired and unusable inventory, and had only $2,042,382 worth of property and $593,696 worth of equipment.

50. The Measure 8 Parties allege that, after discovering N. Khanna's misrepresentations, N. Khanna did not return Sentia's remaining funds to the Measure 8 Parties and dissolve Sentia as they requested, but instead sold Sentia's assets to a non-viable company.

51. N. Khanna, K. Khanna, and Angelo Lombardi (collectively, "Counter/Third-Party Plaintiffs") allege counterclaims against the Measure 8 Parties, as well as third-party claims against Boris Jordan, Sunny Puri, Peter Clateman, Juan Pablo Martinez, Cura Partners, Inc. and Curaleaf Holdings, Inc. (collectively, the "Third-Party Defendants").  A true and correct copy of the counterclaims and third-party claims filed in the Measure 8 Lawsuit is attached hereto as **Exhibit 4**.

52. The Counter/Third-Party Plaintiffs allege that Mr. Jordan is the Executive Chairman of the Board of Curaleaf, who owns approximately 30% of Curaleaf directly and indirectly and controls a majority of Curaleaf's super-voting shares, effectively giving him control of Curaleaf.

53. The Counter/Third-Party Plaintiffs also allege that Mr. Jordan is the Founding Partner at Measure 8 Ventures, LP, as well as a director of both Cura Partners and Sentia.

54. The Counter/Third-Party Plaintiffs allege that Mr. Jordan bought Cura Partners through Curaleaf, and that he sat on every side of the transaction.

55. The Counter/Third-Party Plaintiffs allege that, soon after negotiating the sale of Cura Partners to Curaleaf, Mr. Jordan sought to renegotiate the terms of the sale.

56. Under the original terms of the agreement, shareholders of Cura Partners would receive 95 million shares of Curaleaf stock.

57.  Mr. Jordan allegedly reduced Curaleaf's purchase price from 95 million shares of Curaleaf stock to 55 million shares with the remaining 40 million shares payable only if Cura

Partners' Select brand met certain sales targets in 2019 (the "Earnout Targets").

58. Although the revised terms of the deal reduced the price Cura Partners' shareholders would receive, Mr. Jordan allegedly ensured that his own investment vehicle – Measure 8 Ventures, LP – did not get harmed by using Measure 8 Venture's power to veto any acquisition of Cura Partners as a threat to acquire an additional 1.2 million shares of Curaleaf stock.

59. The Counter/Third-Party Plaintiffs further allege that Mr. Jordan used his absolute control over Curaleaf to ensure that the Select brand could not and would not meet the Earnout Targets, by implementing new accounting practices, new sales practices, new product innovation practices, and new distribution practices to ensure that the Select brand did not meet the Earnout Targets.

60. The Counter/Third-Party Plaintiffs allege that, because Cura Partners did not meet the Earnout Targets, Mr. Jordan has been unjustly enriched in the amount of at least $515.6 million, and N. Khanna and K. Khanna had to pay an additional 1.1 million shares of Curaleaf stock to aggrieved investors, including Measure 8 Ventures, LP.

61. The Counterclaims and Third-Party Complaint allege causes of action for unjust enrichment, breach of fiduciary duty, civil conspiracy, tortious interference with contractual relations, indemnification, reimbursement and advancement of expenses, and breach of contract against the Measure 8 Parties and the Third-Party Defendants in some combination.

62. On September 27, 2022, the court overseeing the Measure 8 Lawsuit dismissed the Oregon state law securities claims based on forum selection and/or arbitration clauses in the Measure 8 Parties' debenture agreements.

63. The breach of fiduciary claim against N. Khanna is the only cause of action remaining in the Measure 8 Lawsuit.

II. **The Measure 8 Arbitration**

64. After the court in the Measure 8 Lawsuit dismissed the Oregon state law securities

claims, on November 15, 2022, the Measure 8 Parties filed a demand for arbitration against the same Underlying Defendants, and added an additional defendant, David Thompson (former general counsel, chief administrative officer, and director of Sentia and former general counsel and chief administrative officer of Cura Partners and Cura Wellness) (the "Measure 8 Arbitration Demand").

65. The Measure 8 Arbitration Demand alleges securities fraud in violation of Oregon and federal securities law claims arising out of the alleged untrue statements and misleading omissions of material facts made by the Underlying Defendants and Thompson to solicit and induce the Measure 8 Parties to purchase over $74 million in debentures in Sentia.

66. On December 7, 2022, the Underlying Defendants filed a Petition to Stay Arbitration in connection with the Measure 8 Arbitration Demand in the Supreme Court of the State of New York, Index No. 654680/2022.  A true and correct copy of the Petition to Stay Arbitration with exhibits is attached here to as **Exhibit 5**.

67. The Measure 8 Arbitration Demand is attached as Exhibit F to the Petition to Stay Arbitration.  Ex. 5 at pgs. 259-326 of 335.

68. On December 8, 2022, the court stayed the Measure 8 Arbitration on an interim basis pending ruling on the Petition to Stay Arbitration.

## INSURANCE COVERAGE DISPUTE

69. Defendants seek insurance coverage from Hallmark for the Reported Matters under the Hallmark Policy.

70. Hallmark disputes that coverage exists for the Reported Matters under the Hallmark Policy.

An actual, present, and bona fide controversy exists between Hallmark, on the one hand, and Defendants, on the other hand, with respect to whether there is insurance coverage for the Reported Matters under the Hallmark Policy.

71. A judicial declaration is necessary to establish the parties' rights and duties, if any,

under the Hallmark Policy.

## COUNT I – DECLARATORY JUDGMENT

### (Curaleaf Exclusion)

72. Hallmark incorporates by reference each and every allegation set forth in paragraphs 1 through 72 as though set forth fully herein.

73. The Measure 8 Parties (i.e. the plaintiffs in the Reported Matters) were all shareholders of Cura Partners who became shareholders of Curaleaf in connection with Curaleaf's acquisition of Cura Partners. See **Exhibit 6** at pg. 14.

74. In addition, Boris Jordan, who is the founding partner of Measure 8 Ventures (a shareholder of Curaleaf) and a former director of Cura Partners and Sentia due to Measure 8 Ventures' investment in both companies, is also the Executive Chairman of Curaleaf who founded and effectively controls Curaleaf by controlling a majority of Curaleaf's super-voting shares. See **Exhibit 7** at pg. 29.

75. Therefore, the Reported Matters were "brought or maintained by, on behalf of, in the right of, or at the direction of [Curaleaf], its directors, officers, employees, subsidiaries, affiliates, and/or shareholders[.]"

76. As a result, the Curaleaf Exclusion bars coverage for the Reported Matters under the Hallmark Policy.

77. An actual, present, and justiciable controversy exists between Hallmark and Defendants regarding the parties' rights and obligations under the Hallmark Policy with respect to the Reported Matters.

78. The entry of a declaratory judgment with respect to whether the Curaleaf Exclusion bars coverage for the Reported Matters under the Hallmark Policy is necessary and would be effective to resolve the controversy between the parties.

79. For these reasons, Hallmark respectfully request that the Court enter judgment declaring that the Reported Matters are excluded from coverage by the Curaleaf Exclusion and

that Defendants are not entitled to coverage under the Hallmark Policy with respect to those matters.

## COUNT II – DECLARATORY JUDGMENT

### (K. Khanna, Stoller, and Goodman Are Not Directors and Officers)

80. Hallmark incorporates by reference each and every allegation set forth in paragraphs 1 through 72 as though set forth fully herein.

81. Subject to its terms and conditions, Insuring Clause A.1. and A.2. of the Scottsdale Policy (to which the Hallmark Policy follows form) provide coverage for **Directors and Officers**, which is defined in relevant part to include any person who was, now is, or shall become: a duly elected or appointed director, officer, or similar executive of the **Company**, or any member of the management board of the **Company**; any natural person who is a leased employee or is contracted to perform work for the **Company**, or is an independent contractor for the **Company**, but only to the extent such individual performs work or services for or on behalf of the **Company**; and **Employed Lawyers** of the **Company**. (Ex. 1 at pgs. 22, 54, 61, and 74 of 86).

82. K. Khanna did not serve as a director, officer, or similar executive of Cura Partners or otherwise qualifies as a **Director or Officer** as defined in the Scottsdale Policy (to with the Hallmark Policy follows form).

83. Stoller and Goodman served as outside counsel for Cura Partners and are not **Employed Lawyers** nor otherwise Directors or Officers under the Scottsdale Policy (to which the Hallmark Policy follows form).

84. Accordingly, to the extent the Court finds the Curaleaf Exclusion does not bar coverage for the Reported Matters in their entirety, which it does, no coverage is available for K. Khanna, Stoller, or Goodman under the Hallmark Policy.

///

///

///

## COUNT III – DECLARATORY JUDGMENT

### (Non-Insured Capacity and No Wrongful Act)

85. Hallmark incorporates by reference each and every allegation set forth in paragraphs 1 through 72 as though set forth fully herein.

86. Subject to its terms and conditions, Insuring Clause A.1. and A.2. of the Scottsdale Policy (to which the Hallmark Policy follows form) provide coverage for **Directors and Officers** for any **Wrongful Act**.

87. **Directors and Officers** is defined in relevant part in the Scottsdale Policy to include any person who was, now is, or shall become: a duly elected or appointed director, officer, or similar executive of the **Company**, or any member of the management board of the **Company**; any natural person who is a leased employee or is contracted to perform work for the **Company**, or is an independent contractor for the **Company**, but only to the extent such individual performs work or services for or on behalf of the **Company**; and **Employed Lawyers** of the **Company**. (*Id.*).

88. **Wrongful Act** is defined in relevant part in the Scottsdale Policy to mean any actual or alleged error, omission, misleading statement, misstatement, neglect, breach of duty or act allegedly committed or attempted by any of the **Directors and Officers**, while acting in their capacity as such, or any matter claimed against any **Director and Officer** solely by reason of his or her serving in such capacity. (*Id.* at pgs. 22-23).

89. Section C.1.j. of the Scottsdale Policy precludes coverage for **Loss** on account of any **Claim** for a **Wrongful Act** actually or allegedly committed or attempted by any of the **Directors and Officers** in his or her capacity as a director, officers, trustee, manager, member of the board of managers, or equivalent executive of a limited liability company or employee of, or independent contractor for or in any other capacity or position with any entity other than the **Company**. (*Id.* at 23-24).

90. The Reported Matters allege certain Underlying Defendants acted in capacities

other than in their capacity as **Directors and Officers**.

91.  Specifically, N. Khanna, Lombardi, Knapp, Thompson, and Slinde acted, in part, as directors or officers of Sentia and Slinde also acted, in part, as outside counsel for Sentia and Cura Partners.

92.  Accordingly, an allocation would be necessary pursuant to Section O. of the General Terms and Conditions of the Scottsdale Policy, as amended by Endorsement No. 2. (*Id.* at pg. 30 of 86), to which the Hallmark Policy follows form.

## PRAYER FOR RELIEF

Plaintiff Hallmark Insurance Company respectfully requests that the Court enter the following relief:

A.  As to Count I of the complaint, Hallmark requests that the Court enter a judgment declaring that the Hallmark Policy does not afford coverage for the Reported Matters;

B.  As to Count II of the complaint, and in the alternative, Hallmark requests that the Court enter a judgment declaring that the Hallmark Policy does not afford coverage to Defendants K. Khanna, Stoller, and Goodman for the Reported Matters;

C.  As to Count III of the complaint, and in the alternative, Hallmark requests that the Court enter a judgment declaring that an allocation is necessary pursuant to the terms of the Scottsdale Policy;

D.  Award Hallmark its costs and reasonable attorneys' fees; and

E.  Grant such other and further relief as the Court may deem appropriate.

## RESERVATION OF RIGHTS

The filing of this Complaint is not intended to and does not constitute a waiver of any of Hallmark's rights, remedies, and defenses under the Hallmark Policy and at law. Additional conditions, limitations, and exclusions of the Hallmark Policy may exclude or limit coverage for the Reported Matters. Hallmark continues to reserve the right to raise all other terms, conditions,

and exclusions as defenses to coverage for any claim made under the Hallmark Policy where appropriate.

Dated: February 23, 2023

Respectfully submitted,

HALLMARK SPECIALTY INSURANCE COMPANY

By: /s/    Jason Wright

Jason Wright (Oregon Bar No. 062168)
Wright Law PDX
1500 SW 1st Ave, Suite 730
Portland, Oregon 97201
(503) 295-6191
*jason@wrightlawpdx.com*

-and-

David F. Cutter (*pro hac* admission to be sought)
Emily R. Tripicchio (*pro hac* admission to be sought)
BatesCarey LLP
191 North Wacker Drive, Suite 2400
Chicago, Illinois 60606
(312) 762-3100
*dcutter@batescarey.com*
*etripicchio@batescarey.com*